When the government takes property to satisfy a debt, and takes more than what is owed, it has a constitutional duty to return or pay for the excess. Here, Geraldine Tyler owed $15,000, which included nearly $13,000 in penalties, interest, and related costs. To satisfy that debt, Hennepin County took Ms. Tyler's former home, which was worth much more than that, and later sold it for $40,000. The county kept all $40,000 for public uses. By taking absolute title to Ms. Tyler's property, including the value that exceeded the debt, the county has taken private property without just compensation. The county could have collected the debt without violating the Constitution by following the traditional common law rule still followed in most states, and still followed in Minnesota in nearly every other debt collection circumstance. Under that rule, the county should have taken the property, sold it, paid the debts from the proceeds, and refunded the remainder to Ms. Tyler. Instead, the county took everything. The county apparently does not dispute that Ms. Tyler had a property interest in her former home or in its value. Instead, it asserts that the government may redefine private property by statute. The consequence of that would be an unlimited power to define away private property and to confiscate it to pay debts no matter how valuable the property or how small the debt. But this Court's takings decision, and hundreds of years of common law, Minnesota's own treatment of debts and nearly every other debt collection circumstance confirm that the county has taken private property for which it must pay just compensation. If not remedied with just compensation, then the confiscation acts as a fine, punishing Ms. Tyler for the public offense of failing to timely pay her property taxes. The confiscation of her property should therefore be subject to scrutiny under the Excessive Fines Clause because it goes well beyond compensating the government for any loss. This Court has repeatedly held that an economic sanction that serves in part to punish is a fine within the meaning of the Eighth Amendment. I welcome the Court's questions. If there was no differential, if there was no surplus equity, would there be a taking? Yes, Your Honor. Well, are you asking if the property was worth less than what she owed the county? Or worth the $15,000? There would be a taking, but just compensation would be paid at the time of the taking of absolute title by forgiving the debt. So normally we say that a takings claim accrues when the government takes the property. And how would we know what the value of the property is at the time of the taking, when the sale doesn't occur until years later? So in this particular case, it's true the sale was more than a year later. But trial courts handle valuation analyses all the time, and so they would just use the same analysis applicable in any other circumstance. And they could consider the auction price as probably the best proxy for what the property was worth. Normally we only see these takings claims when you have eminent domain or something that's traditional. So why should we extend it to areas such as forfeiture or taxation in the area of property taxes? Because the right that we're asserting here is a deeply rooted right that a debt collector may not take more than what's owed. So the way that debt collectors ordinarily get around that is by taking the property subject to that traditional common law rule. Blackstone called it an implied contract at law, that they would take the property, sell it in a fair arms-length transaction, usually by auction, and then return any excess after they pay off the debt. But it's a deeply rooted right that's traditionally defined by state law. In some places, your property line goes up to the high watermark. In other states, it goes to the low watermark. And when you take property there, it's wherever the state law has defined it. What if Minnesota has a law sort of going forward? And they say, from now on, in Minnesota, if you get property, you have to know that we, the state, are going to take it if you don't pay taxes for three years. And people go in with that expectation. The market value is discounted because of that. If the eventuality occurs, there's no taxes for three years, they take the property entirely. Is that a taking or not? It's still a taking, Your Honor. I would point this court to its decision in Horn, which said that no one ever actually expects their real or personal property to be taken. And while the government can redefine the boundaries of property rights with things like statutes of limitations, what it can't do is outright confiscate property, just like the court held in Phillips. There is a deeply rooted traditional right that while states had carved out exceptions through rules like the IOLTA programs, that nevertheless, the government would not be allowed to carve out the self-dealing exception. Well, then, if it's not defined by state law, what's it defined by? Well, I think Minnesota state law does support our position here because in every other debt collection scenario, they protect the debtor's interest in the excess value of their property. So if you owe a debt, the debt collector doesn't get to take everything.  As Rufus Waples said in his treatise, an indebted thing can only be condemned to the extent of its indebtedness. Well, there were states, I guess, Virginia and Kentucky, that had a similar procedure as Minnesota here today, way back when, I guess, before the founding or at the founding. Now, if you own property in Virginia, and there was that basic common law or statute in that case, would you have a takings claim that somebody acted, if the state took your property, consistent with a provision in law that had been in effect from the beginning? I would say so, yes, Your Honor. As this Court noted in Bruin, a few localized exceptions do not mean that this isn't a traditional deeply rooted right. Well, back then, Virginia was hardly localized. I mean, it was a large and important state, and I think the western boundaries of it hadn't yet been defined. Different states had different rules, and they chose to have a rule that had an exception to what, today, we might think of as common definition of property. Yes, Your Honor, but Virginia's rule was short-lived. The legislature actually ended up extending the period of redemption almost 50 years, and on top of that, the courts apparently didn't enforce the forfeiture. Hennepin County failed to cite even a single example where there was a forfeiture of value, not just a forfeiture of title, and I want to highlight that distinction. As this Court noted in Bennett, a forfeiture can be a forfeiture merely of title that still protects the surplus, and so there's a lot of examples that they cite that mention the word forfeiture, but that tells you nothing about how it was actually implemented by the Court. Did the Virginia State Constitution have a takings clause at that time? Because, obviously, the Bill of Rights didn't apply to Virginia then, so I'm just wondering, would those statutes have even been held to that standard? I'm not actually certain, Your Honor. I suspect it did, but nevertheless, it's still a confiscation. It's something that's recognized as private property in every other debt collection circumstance, and that there was a single exception that was actually narrower than what Hennepin County does. They only were able to take forfeit the land, essentially, if personal property was insufficient. Well, sure, we wouldn't necessarily look to the Alien and Sedition Acts for the original meaning of the First Amendment. Let me ask you a question. Would you be satisfied if the statute was similar to the one in Nelson that permitted the surplus to be recovered? For purposes of this case, yes, Your Honor. For purposes of this case. Are you reserving the possibility of challenging Nelson itself? I personally don't like Nelson. Okay, but that's not the question. For purposes of this case, I'll accept your qualification. Do you agree that under Nelson, if Minnesota had had the sort of conditional redemption built in that the New York statute did in Nelson, that the Fifth Amendment would be satisfied? I mean, I'm not going to go that far, but I will say that this case is distinguishable on that basis. And because there is no opportunity to claim the surplus in this case, unlike in Nelson, Nelson, even if you think it's binding, it's completely distinguishable. Why do you personally not like Nelson? Because I think it's problematic. It suggests you have to bring a takings claim before the taking has even occurred. And that would leave people, it kind of flies in the face of this tradition that the best way of putting a person on notice from a taking is to actually take the property. And at that point, you can then go claim your just compensation or file your takings claim if they have not offered just compensation. So, do you think that there is any way to create a scam even to take the property and remit the surplus? Yes. As the amicus brief by Utah, joined by seven other states, explains that most states do just that. They take the property subject to that traditional common law right, they sell the property, and then they have a claim of funds from which property owners may claim it after it's been sold. You noted that Minnesota has penalties here. What do you think the limits of penalties are? Before they become excessive? Well, I'm just thinking that you can call anything anything. What if a state just called this scheme a penalty scheme? Well, then I think our excessive fines claim would obviously provide significant relief. Even if they were to try to enumerate the amount of money owed and it was somehow swallowed up the value of the property, I think the excessive fines clause applies. But the takings clause applies because they've completely untethered the amount from any set statutory figure. Instead, they're tethering the amount owed to the value of the property, essentially trying to swallow everything up left over. I'm not sure I understand that. I mean, suppose that there were a statute that said, you know, 50%, 75% of the property we're just going to take as a penalty. I think if the government is essentially, at some point, I think it becomes a taking. That line is harder to draw than the line that you've got here, where we're not challenging the set penalties, interests, and fees and the $15,000. Instead, we're saying that the government can't just simply say that we get to take everything left over after that. It would be... Well, I guess, you know, at some point, I mean, suppose that this entire scheme were just rephrased as a penalty. If it's still just tied to the value of the property, I think you still have a very good takings claim there. And, of course, the excessive fines claim would also still apply. Counsel, back to Nelson for just a minute. The suggestion that you have to exhaust a pre-deprivation process under state law, in that footnote in Nelson, and I understand that it wasn't briefed and it came late in the day. How does it fit with this court's subsequent decision in Nick, which seemed to suggest you don't have to exhaust state law proceedings to bring a takings claim? I think it conflicts directly with Nick in that it suggests, in order to have it... Your takings claim is overcome if you fail to use a state court procedure, the foreclosure procedure, to stake your claim. Whereas Nick says that the moment a taking occurs, regardless of whether there's a state court procedure that might end up in compensation, you have a takings claim and you can go to federal court and bring your takings claim. In order for you to win, is it necessary for you to convince us that at the time of the adoption of the Constitution, a mortgager was regarded as having an equitable property interest in the surplus? No, Your Honor, it's not necessary for us to show that because today we all recognize that we have personal property in our real estate. And that real estate is protected by the takings clause. A financial interest connected to real estate is protected by the takings clause, as this court said in Coons. And so, either way you cut it, we don't have to be able to prove the history. All we have to do is look at this court's modern takings decision. Well, don't you have to show that you have a property interest that was taken? And I assume you don't want to argue that a property interest is whatever a state now says is a property interest. So where do we look if we don't look to the understanding of property interests at the time of the adoption of the Constitution? I think this court has, I mean you can look at the history, but I think that this court has acknowledged that some property interests exist, like in physical property, exist regardless of what state law says. This court did not look to California law in Horn when it decided that raisins were private property. And it said in James Daniel Goode that no one could contest that real estate is private property. And the right we're talking about, the right to being paid for the excess value in your property, is sort of like the interest in Phillips, where this court noted that interest follows the principle like a shadow follows the body. And this is the same sort of interconnected property interest. Just one follow-up question on this. Do you have a response to Professor Kelly's amicus brief where he argues that it wasn't recognized historically that a mortgager had that property interest? I mean, I think it would ultimately be irrelevant even if you were correct. I think the whole opinion is good. I think Justice Viviano's concurrence in Raffaelli also discusses the history of the mortgager's interest, but ultimately it's irrelevant because in the tax collection context, it goes all the way back to Magna Carta, but the government could not take more than it was owed. And while, you know, the county has pointed out that there were some feudal practices associated at the time prior to the founding, there were feudalism practices with the statute of Gloucester, and with quit rent, that was not tax collection. That was the feudal practice of a lord who his tenants owed him fealty services or rent. And this country outright rejected such practices. So I think when you look at the history of tax collection, it's very clear that there were limits on how much could be taken throughout our nation's history and then also dating all the way back to Magna Carta. Counsel, I'm interested in the aspect of the state statute that affects a sale to the county. And I would take it that you wouldn't think that Ms. Tyler was owed anything if she had actually sold the property to the county for the amount of the tax debt. If they then went on and sold it for a higher price, she wouldn't receive anything as a result, right? I think you're correct, yes. Because that would be voluntary. So is that the difference? I mean, in this statute, there is a part of it, as I understand it, and you can correct me, in which the property is sold to the state by operation of law for an amount equal to the unpaid taxes. So is it the difference? And you're claiming that she's entitled to the excess. So is the difference that in the first scenario we have a voluntary sale? Yeah, it's a fictional sale, essentially just a way of administratively transferring title. But what's required by the Takings Clause, at minimum, is that there is a sale that's arm's length, transaction to the highest bidder, can't be fraudulent, can't be collusive, can't be the self-dealing sort of fictitious sale. But you agree with the SG that the taking is happening at the time of the transfer of the absolute title? Yes. Not later. Right. We just focused in on the equity portion. It's sort of like it's another way of looking at the same question, I think. I'm sorry. It's not another way of looking at the same question. Your question asked whether there was a taking of the surplus. The SG is formulating this differently. It's formulating it as a taking at the time of title. And that formulation has huge impact. If it's just the surplus, then the auctioneer's price sets the surplus. If it's the SG's formulation, there's a whole lot of questions. What happens if there's a stock market crash the day after the taking and the value plummets? Is the state responsible for that decrease in price? These are big questions. And tell me why we should address it here. Why don't we just address the question you presented, which is the surplus question? Sure, Your Honor. I think we phrased it as the value that exceeded the debt. But as far as the possibility of the price changing after that. I have it. Whether taking and selling a home to satisfy and keeping that surplus value as a windfall violates the takings clause. Sure. So what we were trying to get at is that there is this taking of the surplus value. If you were to hold that it was the surplus proceeds from the auction, I think Ms. Tyler would be more than satisfied with that. But the question I think you might be getting at is how can counties go forward with collecting taxes without putting themselves at risk for paying? That's the bottom line. That's what you're talking about. Okay. Here you have a debtor who basically doesn't want to do anything. What's the county supposed to do to protect itself? Your answer is sell it at a regular auction. Yes. But there are a lot of things that could affect that. Time will pass no matter what. Sure, yeah. And I think that as long as they take it subject to that traditional interest, the traditional requirements that they have a fair auction and they sell it without collusion or fraud, that satisfies the takings clause. Because the government is not purporting to take the entire whole. They're only trying to take their share, convert the real estate into a pool of money so they can divide it up according to the liens in the property. But as far as takings that have already occurred, the way to traditionally look at that would be from the time of the taking. Thank you, counsel. Just one additional question. How do you deal with adverse possession? You know, the idea in state law, and I think most states don't have it, that if somebody lives on your property for whatever number of years, 17 or something, and you don't do anything about it, he gets to keep it. Under the operation of state law. Why isn't that a taking? Because there you have both a statute of limitations that basically just allows the dealing of stale claims between private parties. There's a time where it gets cut off, where the property occupier can have some reassurance that their title is clear. I mean, he doesn't really have a title, right? I mean, he gets it at the end of the...  Yeah, but even if there wasn't, there's some reassurance that at some point the property becomes theirs. But that's based on the idea at common law that the owner, seeing this open and obvious use of their property, has consented to it. And here you wouldn't have that because the government took the property in July 2015, and that's when the government took the right of possession as well. Well, I mean, if it's a law, I think you can say that. You know, if you don't pay your taxes within three years or whatever it is, under state law, you've been deemed to consent to sheathing your property or something to the state. I don't see that it's terribly different. In each case, the property interest is defined by state law. Well, I think that with, for instance, adverse possession, if you were to try to carry the analogy over, it would be sort of like if after the government took title in July 2015, and they moved somebody else in there, and then she had three years and still didn't bring a claim, they could cut it off with a statute of limitations. Justice Thomas? Justice Alito? Does your theory apply to property other than real property? For example, I believe that some cities impound vehicles where the owner has unpaid tickets, and then if the owner doesn't pay the amount that's due, the city will sell the car and keep the proceeds, put them into the city's general fund. Would that be unconstitutional in your view? Yes, Your Honor. And I think that the history of tax collection or debt collection from the government is pretty uniform on the question of personal property. In fact, in Minnesota, Hennepin County, for example, if they're collecting personal property taxes, they're not allowed to take more than what's owed. And so I think if you have a personal property situation, the same principle would carry over. Justice O'Meara? If we were to rule in your favor on the takings clause, why would we reach the excessive fines clause? Well, we presented it in our brief because it was dismissed on a motion to dismiss, but you could decline to answer it because the takings clause would fully remedy Ms. Tyler's harm. Justice Kagan? I'll go back to the question I asked you earlier, Ms. Martin, because I'm not quite sure I understood the answer. So suppose that there were a state that said we're going to sell a property when there's been some number of years of unpaid taxes, and we'll remit some of the surplus value to the owner, but by no means all. This has been a burden on us, and we're going to keep 50% as a penalty. How would we go about thinking about that constitutionally? I think that's a harder question to answer. The amount certainly above 50%, I would presume, would be a taking. The amount below the 50%, perhaps it's also a taking, but it's a harder question. Is the amount above whatever the state declared as a penalty, so that if the state declared 55% as a penalty? Yeah, I think it's a problem if the government is tying the amount of the penalty to the value of the property that it wants to take. But then that's a problem for a 2% penalty. So the penalties here aren't expressly tied to the value of the estate, they're tied to the debt owed. The analogy you're giving is where they're tying it to the value of the thing that's indebted. And that's why I think we're still in the takings territory and not just merely perhaps there's an excessive fines claim and a takings claim. Sorry, this is not as clear as I would like it to be, but I think it's an easier question when the government has... I guess the reason I'm asking that is because it does seem to me, when does this takings analysis come into effect? I think when the government has the $15,000 accounted by statute, and then they just simply purport to take everything left over. I know everything, but what I'm trying to say is how about less than everything? How about 50%, how about 10%? I think it's probably still an issue if they're tying the value to the estate. But I think it gets harder, the line drawing gets harder if they're being clever the way that you're being clever. I mean, that's a clever idea. It sort of seems like a kind of obvious idea, but okay. Nobody's doing it as far as I know. Well, because everybody who wants to do this is doing what Minnesota is doing. Yeah. How about abandoned property? Does the state have a right to say at some point, you haven't paid taxes for five years, I believe Ms. Tyler was not living in the house either. You haven't paid taxes, you're not living there, we're going to consider it abandoned. So forget whether anybody else is using it. This isn't really an adverse possession case. But at some point, does the state have a right to say we consider this abandoned? I would say Minnesota does not allow the abandonment of real estate, even for failure to pay property taxes. We cited the case Kruger in our reply brief. Even 30 years' failure to pay property taxes did not constitute abandonment of real estate. Well, how about if some state wanted to just say, you know, we have a rule. You don't pay taxes for five years, you're not living there, we're going to consider the place abandoned. I think that would still be problematic, Your Honor, because there's a lot of reasons why people don't pay their property taxes and a lot of reasons why people move out. We've seen examples of people who are moved into nursing homes and all sorts of unfortunate circumstances. And so we do not contest the government. Certainly the government can tack on penalties, interest, and fees, and they can forcibly sell it and take their cut. But when you just attempt to take everything left over after that, that's taking. Thank you. Justice Gorsuch, Justice Kavanaugh, Justice Barrett. Your answer to Justice Kagan, because I was wondering the same thing. I mean, I think that in the county's brief, it blurs the line between abandonment and forfeiture in this situation. So what is really the point? And I guess this is kind of similar to what Justice Kagan was getting at. What is really the point of your winning if the county can do the same thing by saying, yeah, we called it a forfeiture, but, you know, it's really abandonment? Would the analysis be different? Because you can't dispute that we do have a long tradition in the country of abandonment. I mean, counties, states can take abandoned property that's not maintained, for example. Well, so the tradition of abandonment requires an intent to relinquish, which is actually an interesting factual question. And to just suppose an intent because somebody isn't paying thousands of dollars, because they can add on all the other reasons why they might try to claim they think it's abandoned, but ultimately it's a failure to pay property taxes. But if you can't have constructive intent, even if, you know, she's not responded to multiple notices, even after a certain amount of time. I mean, because I presume there are other situations in which there's true abandonment where intent has to be inferred from a failure to show up, a failure to reside, a failure to respond to notices. So the way to deal with those types of abandoned properties is either through nuisance laws, which allows the government to mitigate the problem and charge the cost to the estate, or to simply use the power of eminent domain, take the property. If it's truly dire elect, then, I mean, there may not be a lot of equity in the property, and if nobody shows up to claim the money, that could go through the unclaimed money statute. So this might go back to Nelson and the New York statute. If they want to call it an abandonment, maybe they can call it an abandonment. They can sell it. They can hold the proceeds and give some period of time during which the owner can come and redeem. Yes, I think that would be reasonable. Thank you. Justice Jackson? Just to be clear, with respect to this statute, it doesn't require any of those factors. That's exactly right. It's just the not payment of taxes. The county can take these steps. That's right. With respect to your excessive fines argument, what is the best argument for characterizing this as at least partially punitive? Your friends on the other side say this is clearly remedial for a number of reasons. Obviously, the government has the ability to take taxes and, you know, abandon property and do all sorts of things. So why would this be best characterized as partially punitive? Well, the county below argued that this was at least intended partly to deter failure to pay property taxes. As this court has said repeatedly, that deterrence is a marker of punishment. And so I think that is a very strong. Haven't we also characterized deterrence in a civil or non-punitive way as well? Sure. So the question then would be, is it essentially trying to deter conduct that is not allowed, that causes a public harm versus a private harm? And so I would point to the court's opinion in Kokish, which talks about the difference. What makes something a penalty? The question is, is it a public harm? And does it go beyond mere compensation? And should we draw anything from the characterization of the other side as this sort of partially being Ms. Tyler's fault, that she could have sold it herself, for example, but she didn't, and so now we have to do it? Is there something punitive about that kind of approach to this? Well, that does sound a little punitive. And that would be something that I think, you know, her culpability would be something on question on remand. That would be a question to answer on remand because the excessiveness question isn't before the court. And, of course, none of that would be relevant to the taking analysis. Thank you. Thank you, counsel. Ms. Ross? Thank you, Mr. Chief Justice, and may it please the court. Taxes are not takings. As the parties agree, when a taxpayer fails to pay her full tax debt, the government may seize and sell property to recoup the money it has owed. But that power does not encompass the power to extinguish an owner's full rights in property that is worth more than the tax debt. When the government obtains absolute title to such property without any mechanism for the owner to recover excess value, it engages in a potentially compensable taking. History and precedent strongly support that rule, and the decade after the founding, the federal government and nine states all limited the government to recovering the value of a tax debt. And as this court has held, at least in the context of confiscatory laws, the government cannot define away a longstanding property interest to favor itself alone. The government thus agrees with Petitioner that she has stated a claim for a taking. Though, as Justice Sotomayor noted in the government's view, the relevant property interest is Petitioner's fee simple title, not any, quote, equity in the property. While the value of the property may affect the measure of just compensation, it is not itself the relevant property interest. I welcome the court's question. So with that said, what would you do with a case in which the government, which it often does in eminent domain cases, simply kept the property and did not sell it? So I think in all cases, and this I think is responsive to Justice Sotomayor's questions earlier as well, the question is, you know, what was this property worth at the time of the taking? And so we do think valuation here does have to happen with respect to when absolute title was taken in 2015, whether there's a sale or not. I think when there is a tax sale, that can be very relevant evidence of the amount of compensation that's due. Because even though that tax sale happens later and is a forced sale, this court has been clear that just compensation has to be just to both the public and the property owner. And it would not be just to the public to ask that the state effectively provide some value that was not realized in the tax sale. How would that work here? You're talking about a condominium. And from what I can tell, the only way you knew of this differential between the taxes owed and the value was because it was sold. How would you determine the value of it if you never sold it, if the county never sold it? So Justice Thomas, I think as my friend mentioned, you know, courts do this all the time. If the government condemns a property, it's not necessarily going to sell it. And so courts do have valuation mechanisms. I don't know specifically if they look to other sales of similar property. I would assume that's how they do it. But I don't think this is a problem that's unique in this context. And if I could just take a step back and explain why we think the difference between the interests here as we define it and as my friend defines it is important. You know, Petitioner speaks about this as equity and property. I think if there's a freestanding equity right, that could be problematic in some of the court's other lines of cases. So most notably in the regulatory takings context, this court has long understood that the government may enact regulations that can affect the value of property, sort of adjusting the burdens of economic life, as this court has said it, and that that is not always or even, you know, often going to be a taking. And so I think it's much more straightforward to think about this as she had absolute fee simple title. The state took all of that without recognizing that the property might be worth more than the tax debt. And so what's really at issue is, you know, cashing out that property interest in the back end. Ms. Ross, you're throwing a bomb into two hundred and forty, fifty years of history with respect to delinquent taxes and sales, only because if you define it as the time that state takes title then and valuation as of that date, nothing's going to ever happen where a state's going to take that risk because properties have to be sold. The state's being forced into being the agent for the seller, and it's going to have to take all the risk and all of the responsibility for whatever happens to that property until it's sold. Why would any state want to do that? And why are you forcing states into that? Your adversary took a simple position. I'm entitled to a surplus. I think that's the question we should answer. The government's forcing us into a much more radical position. So respectfully, Justice Sotomayor, I don't think it is more radical. Again, I think, you know, we're trying to protect the court's regulatory taking jurisprudence, among other things. But I think the analysis would really work in much the same way under our rule or petitioner's rule. Not at all. Well, if I could explain why. I mean, again, I think the absolute title is the moment, but we completely accept that you're going to use or you can use the later tax sale as a very good proxy, and perhaps in almost all cases, if not all cases, actually the value of just compensation at that time. Except the day that there's a stock crash. There's a stock market crash the day after the property is transferred. I think you could conceptualize the taxpayer's failure to pay her taxes as agreeing to essentially the later tax sale as a measure of just compensation, if you're concerned with that. If I could just hit the history. Before you do that, just to finish up this line of questioning, do we even need to decide this? The question for us is they're taking here. Yes. Both of you agree on that. And then the question becomes a matter of valuation. And do we have to decide that in this case? You do not, Justice Gorsuch. I, you know, I'm simply trying to respond to the question. And, you know, this concern about equity versus surplus and why we think it matters. If I could briefly hit the history. I just want to answer Justice Barrett's question about Virginia. Virginia did not have a state just compensation requirement at the time. It did have a separate requirement that when the state affected property rights to do it through the legislature. So there's some language about, you know, taking property that way. But there's not a separate just compensation requirement. I think what's really significant is I'm not aware, at least my friends can certainly tell me if I'm wrong, of any state in the early period that was bound by a constitutional just compensation requirement and had a scheme like the one that's at issue here. Your friend doesn't like Nelson and thinks it's inconsistent with Nick. What do you think? So we're perfectly fine with Nelson, Justice Kagan. I think both personally and as the government, I think that Nelson very clearly kept this issue to one side. So if you look at page 110 of the decision in Nelson, where the relevant discussion, short discussion is, it says, but we do not have here a statute which absolutely precludes an owner from obtaining the surplus proceeds of a judicial sale. And so I think the court's constitutional holding in Nelson was very much carving this precise situation out. In terms of the relationship to Nick, I don't actually think there's any tension there. I think, you know, this is a very specific situation in which everybody agrees that the government can seize and sell the property. And so I think that the procedure that was issued in Nelson is really just an accommodation for that odd set of facts. And I don't think it's inconsistent with Nick, because it's basically defining whether a taking has happened in the first place. Given the distinction between you and Petitioner, the fact that because everybody agrees that the government can take fees and sell the property, your position is the taking has occurred when the government takes the entirety, absolute title, that at the moment of the seizure, the only thing the government is really entitled to is the tax amount and not full title, absolute title. Isn't that sort of the essence of your point? I think that's correct, Justice Jackson. Of course, you know, with the caveat that what they're entitled to is the tax debt, meaning including the penalties and the interest. Yes, that's what I mean. But they're not entitled to an absolute forfeiture of the entirety of the value of the house at the moment of the seizure. That's correct, Justice Jackson. And this, I think, goes to some of the earlier questions as well. You know, if the state had a system where it recognized that it's not entitled to the full value, and so it therefore had a mechanism to cash out that value on the back end, there would be no taking. And so we wouldn't be thinking about this in terms of just compensation. It would just be a statutory question of, you know, have you gotten the amount that the statute said you would get, which presumably would be the tax. And so the taking takes place whether the government then goes on to sell it or not, in your view. Exactly. And I think that that's, you know, one problem with the way the Court of Appeals looked at this in this case was it said, you know, you didn't have any right to the surplus at the later time because the state had defined away the surplus. But that also suggests, you know, that just by keeping it, there would be no taking. And I think that can't be right. Ms. Ross, given the difference between you and the petitioner, how does the government recommend that we resolve this case? So to quote one of my colleagues, the way that we said in our brief, you know, I think that we think the absolute title, the taking of absolute title without any mechanism for recovering the excess value is a taking. And I think to Justice Gorsuch's point, that's probably enough for the day. So just vacate and remand on that? Yes. I mean, I think you would reverse the decision insofar as it had dismissed the complaint. We have a lot of debates about is it reverse or vacate and remand. But you're saying, you know, it's not an affirmance. And there would be a possibility, in your view, of her amending her complaint if she didn't state the question properly. Is that what the government thinks she should do? I guess, you know, I think that I read the complaint to sort of be broad enough to include both theories. But I guess the district court could figure out whether that was necessary. We do agree with petitioner and I think respondent on this point that the court need not reach the excessive fines clause if it decides the takings issue in petitioner's favor. Thank you. Counsel, I was interested in your raising the regulatory taking question. So let's say you own property in a particular place, you know, on the lakeside or something and it's worth a certain amount. And the government comes along and says, well, in the future, this property can only be used as a turtle refuge because there's endangered turtles there. It reduces the value of the property by 90%. And as a government, you would argue that's not a taking for a variety of reasons. And there's all sorts of things in our case law you could look to. Or let's say the government says, well, we don't need all the property. We're just going to take, you know, 90% of it. And when you get 10%, you're still left. Reduces the value of the property by 90%. Same, same thing. That one's a taking, right? I think that's right, Mr. Chief Justice. And I think that just reflects this court's precedence that, you know, you can do a lot of things around property. But sort of as the court said in Horn, it's different when you come in and you physically take the property. It's different when it's raisins in Horn. But it seems to me that the distinction must be based to some extent on the idea that there is an irreducible core of what constitutes property as opposed to being regulated. You know, taking one square inch of that property is going to be a taking. And regulation that reduces the value much more doesn't. Is that part of the way the government sees the case? I think that's right. I mean, I think that's what this court's cases certainly have said. I think, you know, that's a reference to Loretto and sort of putting the antenna on that itself is enough to be a taking. And I think, again, you know, this court's decision in Horn strongly supports that, among other decisions. Well, is there some – if there is an irreducible core to the property, where does that come from? So I think, you know, if you wanted to look for history – look to history here, that's very strong, obviously, if we're talking about an irreducible core of sort of the physical property itself. Again, you know, most states didn't think they could extinguish all of your rights in the physical property. So I think history is certainly one place you could look there. I think you could also, as my friend was saying, you know, look at how the state today treats similar situations. I think there's a real concern in this case of sort of the state having one rule for most situations and then a different rule for this one. Would it be based to some extent in the takings clause itself? The Constitution uses the term property. It must have some meaning. And the framers seemed to think it was worth protecting. And I wonder if that is a concept that is carried over into state law from the federal Constitution. I think that law might be the case. I mean, again, I think, you know, for this case, it's really enough to say this is sort of the quintessential type of property. We have a general rule that when the government comes in and physically takes your property, that is a taking. And then, you know, there's obviously the accommodation for the tax clause – or excuse me, the tax power. And the question is really just how those fit together. And so I think history here is a good guide for that. Justice Thomas? Justice Alito? Can the government also keep its administrative expenses that it incurs as a result of having to go through the process? Absolutely. Can it impose a penalty for failing to respond or for anything else that the property owner may do in connection with this proceeding? I think it can, subject, obviously, to other constitutional limitations. I think this goes to Justice Kagan's questions earlier. You know, this court's decision in Eastern Enterprises sort of – it's really the controlling concurrence by Justice Kennedy and then the four dissenters, but sort of drew a line between when the government tries to take physical property or a specific sum of money, a specific pot of money, as in Webb's or the IALTA cases. On the one hand, we think of those as takings. And then when it just assigns a penalty, we sort of think of those differently. Under what circumstances can the state or the federal government, I guess, say, we consider this property to have been abandoned and therefore we're going to keep the complete value? So I think abandonment is far different. It's sort of solving for the problem of has this person really relinquished all property interest, all intention to use the property? So if you look at a case like Texaco, on which my friends rely heavily, there were a number of indicia of non-use of the property, and it spanned over 20 years. Here, by contrast, we just have five years of non-payment of taxes, and it would apply in exactly the same way if she lived in her condominium and was exercising every right in the bundle of sticks and just failing to pay property tax. So I think this is a far cry from a classic abandonment situation. Would abandonment be limited to the situation where the state doesn't know where the person is? Suppose the state knows where the property owner is, and the property owner has not allowed the property to deteriorate and become a health or safety hazard, but just simply continues to refuse to pay taxes or fail to pay taxes. Is that an abandonment? Would that be considered an abandonment and, therefore, take the situation out of the takings clause? So, Justice Alito, you know, I apologize. I don't have sort of a fine point at which it would become abandonment, but I think it's helpful to see sort of how far this is from abandonment. I do think states probably have some flexibility in how they define abandonment, but, you know, the fact that I don't think this would probably suffice, but even if it could, as this Court said in Horn, you know, this is an area in which the Constitution is concerned with means as well as ends, and so I think the fact that it might be able to accomplish the end some other way doesn't remove this from the takings power. One last question, and one that I asked the petitioner. Would your theory apply to personal property as well as real property? So, I apologize. I haven't thought deeply about the history or as deeply about the history with respect to personal property. I think there's pretty strong history on the petitioner's side with respect to that, and obviously this Court's decision in Horn said, you know, people don't expect the government to come in and take your grapes, just as they don't expect it to come in and take your property, and so I think there would be a debate there, but there would be some points in the property owner's favor. Thank you. Justice Sotomayor? Justice Kagan? Could you say a few more words, Ms. Ross, about this penalty question? I mean, are there any penalties because of the form of the penalty or because of the amount of the penalty one should view through a takings clause lens? So, I think under this Court's precedent, if the penalty is itself the property, and at least we're not talking about, you know, sort of the historic classes of customs forfeitures and things like that that are sort of carved out for historic reasons, then you might think of it in a taking. I think when we're just talking about, you know, the government's assessing a number of dollars and it doesn't really care where that's paid from, that, I think, is not generally thought of as a taking. Justice Gorsuch? Just real quick on the excessive fines question, which I understand you'd encourage us not to answer, but the District Court, on which the Court of Appeals basically relied, said it wasn't a fine or an excessive fine because the primary purpose was to compensate and that the petitioner was given multiple opportunities to pay the amount and that it was partially a deterrent. I don't see how that lines up under our case law as anything other than a fine. We've said it doesn't matter whether it's criminal versus civil. We've said if it's punitive in part and deterrence, we've indicated, is often a hallmark of a penalty. So if we were to reach the excessive fines question, why wouldn't we just at least say that the District Court's reasoning below is wrong? So I think that if you were to reach it, and again, we don't think it's necessary, but if you were to reach it, I think it's clearly not a punishment, even just taking Austin and Vajikajian on their terms, and that's for three primary reasons. The first is there's no relationship to culpability whatsoever. This applies in exactly the same way no matter how or why someone fails to pay their taxes. Second, the variability point here strongly favors the idea that this isn't a penalty because in a lot of cases, or at least in some cases, this is actually going to be a net benefit to the taxpayer. And in some cases, it's going to be even worse for the taxpayer. That's correct, Justice Gorsuch, but what the majority said in Austin in footnote 14 and what Justice Scalia said in the asterisk footnote in his opinion was that it has to be punitive, at least partially punitive in every case. The court hasn't ever said that. So I think footnote 14 of the court's opinion in Austin does suggest that in this context, it should be at the statutory level in deciding whether it's a fine, and so you would have to look across all applications. But the third reason I would give you is that even if you thought this wasn't purely remedial, I don't think it's punitive in any meaningful sense. I think what's really going on here is partially that the state wants to pay, not be left really holding the bag on these properties, and also that it's just easier from an administrative convenience standpoint. Well, what about the fact, as you point out, that in every other circumstance, whether it's for assessing marital property, child support, or private mortgage lender foreclosing, everybody else has to abide by the usual rule that you only take what you're owed. It's just in this particular circumstance the state favors itself. Why isn't that some indication of a punitive purpose? Because I don't think it shows that the state is looking to punish the individuals. Again, I think it shows that it's trying to help itself, and that may well be a reason why we think it's a taking, but I don't think it pushes it over into punitiveness. Thank you. Justice Kavanaugh? Justice Barrett? Justice Jackson? Can I just go back to Justice Gorsuch's point? Because I'm struggling with this notion of variability not being a penalty. You would think that if it was remedial, and it was the kind of thing that some of my colleagues have talked about where they take a percentage as a result of the circumstance, or there's sort of a set standard, that that would be closer to remedial. It feels very punitive, in my view at least, when you're talking about the massive differences that could occur just depending upon arbitrarily the value of a person's home. So, again, Justice Jackson, I think the reason that aspect of it is not punitive is because in some instances it's going to benefit the taxpayer, the taxpayer who owes $100,000. Well, in some instances incarceration could benefit someone who's homeless, for example. That doesn't make it not punitive. I'm not sure that that argument really actually carries the day on the characterization of this. Let me ask you about the relationship to culpability as well. What is your response to the counties in their brief suggestion that this really is kind of the fault of Ms. Tyler because if she just kind of sold it on her own or if she'd taken it into her own hands to do this, then they wouldn't have had to? Isn't that sort of a statement of at least in the nature of a culpability assessment? I don't think so because I don't think they're saying she did it through ill will or something that we more generally think of as punitive or even blaming of her. I think what's going on here, again, is basically that the state wants to put these properties back into sort of the revenue stream. It wants to not have to pay the person back because that's administratively complicated. Things like that that I think, again, may well push it into takings territory but that just don't have a ring of punitive in the sense. I think it's important to take a step back and this court has only addressed the excessive fines clause on a few occasions, and in those cases, they've generally either been criminal penalties or had a very close nexus to them. But you do agree with Justice Gorsuch's evaluation of the precedent in the sense that it doesn't have to be criminal in order to trigger this provision, correct? That's correct, Justice Jackson. My point is simply that this is such a far cry from the cases in which the court has previously considered this clause that it's just even more reason sort of not to reach out to decide the issue here. Thank you. Thank you, counsel. Mr. Confio. Thank you, Mr. Chief Justice, and may it please the court. This court should affirm Judge Colleton's opinion for three reasons. First, petitioner lacks standing. I'll outline two other points and then return to standing as it's jurisdictional. Second, on the merits, the law here falls within a long tradition that stretches back before the Republic, was present at the founding, and is confirmed by the very page of Henry Black's tax treatise that petitioner block quotes. This court in Texaco made clear that when a property right is extinguished due to an owner's failure to comply with reasonable conditions on ownership, there is no taking that requires compensation. That's this case. Petitioner failed to act after repeated notice for five years because owners can act to avert this result. This court has not called such actions takings as Nelson underscores. And third, petitioner's theory would declare many state statutes today unconstitutional and create practical problems akin to what Justice Otomayo referred to, including forcing governments to act as real estate agents and fiduciaries and even forcing them to pay claims immediately at forfeiture well before a property is sold. The merits of this case are no doubt difficult, but I don't believe standing is, so I want to start there. Petitioner, the face of the complaint does not contain allegations that show standing. Petitioner is right to say we didn't make this argument before, we should have. But standing is jurisdictional, it can't be waived, and here it's missing. Petitioner's theory of injury is she had a right to equity, which she defines as, quote, her financial interest in the property after deducting encumbering liens. But her complaint just says excess funds existed after the sale, not excess funds belonging to her. She never alleges she had equity, let alone a plausible claim to it. And the lack of these allegations infects the entire valence of this case, creating a dangerous reality distortion field. Everything petitioner claims about the law and what's in her briefs is about the harm of taking her equity, but the complaint just doesn't allege that. I think I'll bypass the standing. I think at the bottom she's saying the county took her property, made a profit on it with surplus equity, and it belongs to her. But at any rate, can you think, Mr. Katyal, any instance in which a creditor can foreclose on property and or seize property and keep the excess profit or the excess amount over the debt that's actually owed? So, Justice Thomas, with respect to standing, just her complaint and her petition disclaims the idea that she's attacking the taking of the title or forfeiture. That's page 3 of her petition. It's very clear. So as this case comes to the court, unlike the three other cases that are pending before you which raise this issue, she presents the same question presented in two of them. Those are ones which claim surplus equity. They say there's no other mortgage and the like. She's only attacking surplus equity here in her merits brief. That's just not the theory of the complaint whatsoever. So there's a complete mismatch between the two. With respect to your question, which goes to Judge Kaplage's opinion, we agree that it's very different for private mortgages. The whole point that a state like Minnesota and indeed 19 other states are worried about is they don't want to be real estate agents of last resort. With a private mortgage, the bank opts in affirmatively to that, and they say here are the conditions and the like. With this situation, the government is stuck holding the bag at the end of the day, and that's why you have a different tradition. It's a tradition that goes back to even before the Republic, to the Statute of Gloucester in 1278. As the Chief Justice was pointing out, the Virginia Statute in 1790. The Statute of Gloucester. 1292, is that right, Mr. Katchoff? I think 1272, if I recall. All right. Well, you know, a funny thing happened after that. It was called the Magna Carta. And, you know, there's one line in the reply brief that I thought summarized the point pretty well. Let's see here. Apologize, I don't have it right at hand. Yeah. Tyler was not a vassal owing fealty to her lord, but a modern day fee simple owner of real property. And the Statute of Gloucester was about lands owned by the feudal lord and what happens when a vassal fails to provide enough wheat to his lord and can his lands, which really belong to the lord, bespeak to the lord. And I just don't understand what on earth any of that history has to do with this case. So, first of all, Justice Gorsuch, they cited the Magna Carta, which was in 1215. In response, we cited a later and more particular statute, the Statute of Gloucester in 1278. I think Magna Carta was interpreted many, many times thereafter. And we have it in the briefs before us. But how does the rights of a feudal lord have anything to do with the fee simple case? I just am stuck on that. Yeah, so we're certainly not arguing that the king's powers are equivalent to the state's after the founding or that Ms. Tyler is a vassal or anything like that. Good, I'm glad to hear that. That's progress. Yes, of course, Justice Gorsuch. We're saying historically the failure to meet conditions of property ownership, which is that tradition of quint rent, which goes all the way back to that statute, at the founding, that was the template. Look at St. George Tucker, which this court isolated in the Dobbs case as being the authoritative source of Blackstone. What Tucker said, both in his written opinions and in his treatise, is this. In the Kinney case versus Beverly in 1808, he said, under the Virginia Constitution, all escheats, penalties, and forfeitures heretofore going to the king shall go to the commonwealth. And there's a long tradition of tracing that. Tucker says in his Blackstone commentaries, this Virginia statute of 1790 is an example of complete forfeiture. It traces back to the founding. Many states used it in the 19th century, from Maine in 1836 to North Carolina in 1843. The California Supreme Court, of course, has a written opinion all about this and how it's not a takings, because there are reasonable expectations when these statutes are created to say, look, you have complete forfeiture if you don't pay your taxes. Just to interrupt quickly on standing. I mean, a lot of people have property that's underwater. I mean, that they're heavily mortgaged, you know, that they're not going to make any profit of it. But, you know, real estate values change. I mean, the fact that she may have liens on her property that are going to be difficult to pay off right now doesn't mean that the bank or anyone else can just walk in. It's not valueless just because she owes a lot of money on it. Mr. Chief Justice, if she had said that in her complaint and it wasn't just conclusory, which is what Iqbal and Twombly require, we wouldn't be making this argument. But the fact is when you go through the complaint, there's not a word of that whatsoever, and Iqbal and Twombly say you've got to at least rule out reasonable alternatives. Here, the reasonable alternative, the reason why this case looks almost too perfect is because it's not telling you something really important in the complaint. She says, I owed $15,000. She said the government sold it for $40,000. This looks horrible. She doesn't have to negate every possible claim, though. All of this isn't in the record. I mean, if she owes these liens, I mean, it seems to me that's a counterargument that you can make and you could say in valuation, in fact, your property wasn't that. You don't have any of that in the record. Justice Barrett, our point is much simpler, which is she's got to make the allegation that she's got surplus equity. It's actually not in the complaint. But liberally construed, I mean, I think Justice Thomas is right. That's clearly what she's saying. And to the extent there's something that would counter it down. So you're saying she would actually have to say, I am unencumbered by any kind of mortgage or lien? I think that's certainly a way to do it. This is the easiest thing in the world to allege. All she has to do is say, look, there's a dollar of surplus equity at stake. And if you want to look, look at the three complaints that are pending before you, two of which she's filed in Fair v. Continental. Paragraph 4 says the taxpayers, quote, have no mortgage on the property and be stripped of the equity in their home, which they list to be $50,000. In the Meisner complaint in paragraph 37, they say there's no mortgage. And then say they go through the property records. Well, Mr. Kuchel, sometimes people who take out mortgages are personally liable for the debt, even after a mortgage sale for any excess owed. And that's possible here, right? Oh, it certainly could be possible. It's just not alleged. She has to allege that there are mortgages, but that I would be personally liable to them anyway. She's got to allege an Article 3 injury, in fact. So if the theory is that she owes some debt. You're asking us to bring into the record that there are mortgages, okay, and take cognizance of that, even though we don't have that in the pleading. Just let me finish. And I would think, then, if we're going to take judicial notice of that, we'd also take judicial notice of the fact that people often are personally liable for those mortgages and that the money that went to the state here could have been used to discharge her personal debt. And then where are we? It seems to me like we're at summary judgment. No, Justice Gorsuch. So all we're saying is that she's got to allege in a non-conclusory way that there is some debt, that this is a recourse mortgage. She hasn't alleged even that. What about the fact that this is a class complaint, as far as I can tell, as well? How do we account for that with respect to your theory of what has to be alleged? It doesn't itself provide standing. She has to isolate someone who has an Article 3 injury. And these other complaints do that very easily, and for a really good reason. They say there are due process notice problems. That's why people walk away from their equity. When we looked at this case and we asked why in the world would it be that Tyler walked away from her home, the reason, we think, is that there was no equity in the home, and that's why she walked away. That's why this case looks a little bit too perfect. And if you decide this case, as opposed to the three others that are pending before you, I think you get a distorted view of what's going on. But even if there's no equity, I don't understand why that's still not an injury if she says that she's entitled to get the money back from the government. Well, she's got to explain a theory of how she would get the money back if it's already owed, for example, as Justice Gorsuch says, to someone else. She'd get it back because the court would give it to her, and then she would do with it as she would. I guess I don't understand why the fact that she might owe someone else money, there's a lien on it, has anything to do with whether she's injured if she doesn't get it back from the government. Because if she got the money back that way, and she could take the money and I suppose go to Aruba or something like that, that isn't, I think, what could ever happen in the real world. If there is actually a lien, those people would get paid first, the bank or something like that, which is Justice Gorsuch's point about the debt being owed. She's just got to allege any Article III injury in fact, Justice Jackson, and she hasn't done that. When you said it distorts the case, how does it distort the case? Because in the real world, people don't walk away, Justice Kagan, from meaningful equity in their homes. The only way they do that and what pumps up those numbers when they say this is happening in state after state is notice problems. It's due process problems where people don't learn about the situation. And so that's why those other complaints are due process. What do you mean walk away? I don't understand. What do you mean? When you say people don't walk away, did she walk away in this situation? She affirmatively did walk away. By doing what? Just like abandonment. By not paying the taxes? Not paying taxes after the notification and actually telling the county, she told the county and this is what if we ever got to a remand or something we would say, but quote Geraldine Teitel states she did not live at the property anymore and wants nothing to do with it. So that's something we would introduce on remand if we were ever in a world of abandonment. That's what she told the county. And that's one of the other problems we think that goes to both merits and standing in this case, which is if you think about I was just going to say on the merits. At bottom is your theory that the state can define property as it wishes? What is the limiting principle? Isn't that what it's doing here? It's saying whatever you think you have after three years of not paying your taxes, we have it. Your property interest is confined to that extent. Our property interests are defined and confined by a lot of things. But I just want to know if there is something that the state can't touch, what is it and where does it come from? So we think it comes and articulated in this court decision in Texaco at page 530, in which the court said that a government can extinguish an owner's failure to comply with reasonable conditions on ownership. In that circumstance, the court said there is no taking that requires compensation because the court has never required the state to compensate the owner for the consequences of its own neglect. What about perspective? It said, okay, we're having a new regime in Minnesota and everybody who buys property here should know that it is subject to whatever achievement or something. If the state needs it for a particular regulation, you get nothing. That is how we define property. The takings clause depends upon you having a property interest. We, the state, think it's defined by state law. You no longer have that. So we think in that hypothetical, if I understand it correctly, that would state a takings clause violation because it is not a traditional way of understanding property. It's not reasonable. One way of understanding what is reasonable under Texaco is to ask whether it is traditional. And here, the tradition of forfeiture of land starts, of course, with statute of Gloucester. Justice Scorsese's favorite statute. But then it moves on beyond that to statute after statute at the founding, after the founding. And so you can trace it back in the same way, Mr. Chief Justice, is you could look at adverse possession and the Wilcox case from 1831 or the abandonment case. So there's actually some common ground here, it seems to me, that you're acknowledging it can't be pure positive law, state law that governs what is property, right? Correct. And that we should look through tradition and history for guidance. And it's just a matter of how we read that record. That's the real question and dispute here. That is correct. We think that there is actually, when you drill down, they do not have a founder. They do not have a treatise at the founding. They don't have a judicial opinion that says that this is a takings clause violation or anything like that. And you have state after state at this time, including the Bruin period, the founding, that had statutes like this, like Virginia and Kentucky. I thought it was a minority of the states. It was a minority, absolutely. But I don't think that the takings clause should be read like, for example, the cruel and unusual punishment clause with the textual word unusual so that you kind of outlaw the outliers. This court's never read the takings clause that way. Mr. Kitchell, can I just ask you, because there's this point about the government being able to extinguish the property rights of the debtor. And you've said it a couple of times, and it also came up on your friend at the other side's view of this. Although she says what is happening is the government is taking the property and liquidating it, essentially turning it into cash, and that really what it's entitled to is just the amount of the debt. It's not that it's entitled to, as a result of the debt, extinguish completely the property interests or rights of the individual. So what is your response to that? Because I think there's a subtle distinction that's very important with respect to those two positions. So Justice Jackson, two things. One, factually, the government here is not like this is no moneymaker for the government at all. No, I understand that. My question is, when you say the government has traditionally been able to take property, and she's not disputing that in a tax situation the government can take it, but what I think she's saying is you can take it, liquidate it, and extract from it the amount to which you as the government are entitled. And you seem to be suggesting that you can take it and extinguish all of the property interests that she has. And that is exactly what happened at the founding. St. George Tucker's treatise recognizes the Virginia statute does that. The 1837 Arkansas statute is so expressed, Justice Jackson. It says you can sell this for a surplus and use it to pay for school. Are there any limits to that? I mean, $5,000 tax debt, $5 million house, take the house, don't give back the rest? Well, I think this court's decision in Nelson affirmed a scheme in which it was a $65 water bill, Justice Kagan, and the house was sold for $7,000. And this court said that was absolutely permissible. But Nelson had a very easy way for the property owner to get all the surplus value. Oh, au contraire. It's a much, much harder way, Justice Kagan and Nelson. In Nelson, it was a 20-day pre-sale period that you had to file and ask for the surplus. And this court said you only might get it back. I mean, in Nelson, when the state sold the house, you had to file some paperwork, and then you got all the money back. Here, when the state sells the house, there's nothing you can file to get your money back. The state says we'll keep it. And my question is, are there any limits on that? Take a $5,000 tax debt and a $5 million house, and the state says thanks, we'll keep it. So, Justice Kagan, two things. One, on Nelson, I think every part of what you said I don't think is actually a correct description of either Nelson or Minnesota today. So, in the Nelson statute, when you had 20 days to file pre-forfeiture, you filed on the 21st day, you were completely out of luck. You weren't guaranteed anything. You only might get something if you filed. Here, you have five years from the time of you having paid taxes to try and file, to redeem. And then even afterwards, after the government takes your house and gets complete title to it, you have at least six months and perhaps many years to buy the property back from the government. You had none of those options available in Nelson at page 105. Let's just answer Justice Kagan's question. I'd like an answer to it, too. Assume, if we have to, that there is no mechanism for an opportunity to get the surplus value in this statute. And the government takes a $1 million property, or I've already forgotten the numbers, for a modest amount owed to the government, a $5 amount. Taking, no taking. So, two things, Your Honor. First is, it's not a takings, but it very well be a due process clause violation, because there's usually a lack of notice. That if it's a $5 thing- Put aside the notice. Taking or no taking? It's not a taking for exactly the reason this Court said in Nelson at page 110. Quote, it is contended this is a harsh statute. The New York Court of Appeals spoke of the extreme hardships resulting from the application of the statute in this case. But it held, as we must, that relief from the hardship is the responsibility of the state legislature and not of the courts. So, $5 property tax, $1 million property, good to go. That was $65 and $7,000. If you want to overrule Nelson, then we'll be in different territory. But if you start to think about overruling Nelson, I think you get into all the problems that Justice Otonelio talked about. The policy concerns about a bomb basically going off. And my friend on the other side's oral argument illustrates precisely the problems that district courts will have in valuating these things. Her brief says at page 4, her ply brief, that it's the fair market value, which is the measure of things, and that the taking occurs at the moment title is transferred. If that's the case, where here she says was $54,500, that would mean governments are on the hook for $14,500 in this case. If all that's true, and the extent to which you're willing to push the state's authority, what's the point of the takings clause? I mean, that was something that was pretty important to the framers. Why did they put that in there if, in fact, the states, and you say some of them had it, Virginia, Kentucky, were exercising extraordinary authority to take private property? The Constitution seemed to have a different idea in mind. We think there's a vital purpose of the takings clause, and it's really twofold. Number one, there's many circumstances, like eminent domain, in which an individual can't avert the taking whatsoever. I mean, the Constitution says without just compensation. I don't think the framers were ignorant of the notion of eminent domain, but they still wanted to protect private property if you don't pay for it. Oh, absolutely. My point is just that I think central to what the framers were thinking about were circumstances in which an owner can't avert the taking one way or the other. So if the government's taking your house to build a road or something, just compensation, obviously. Cases like Texaco and Nelson recognize, Mr. Chief Justice, that when someone can avert the situation by complying with the conditions of ownership, that's a very different circumstance, just like adverse possession or abandonment or the decision of Texas. Well, eminent domain you can avert, too. If they want to build a shopping mall on your farm, you say, I'll build a shopping mall. They could avert that. Yeah, but I think this court's recognized that that is a bridge too far. And as long as it's a reasonable- That's a bridge too far. But $7, $5 for $1 million is not a bridge too far. Well, the question, Justice Gorsuch, is whether it is a reasonable condition on property ownership. And we think the answer to that, which I think is consistent with your methodology, is to go back and look at the founding and ask yourself whether or not they would consider this a taking. Is there affirmative support for that? It's to the contrary. You have states at the founding. You have Tucker, St. George Tucker, who this court recognizes as a leading authority, saying this is okay. You'd expect someone to have said the opposite at the founding if it weren't. But there is no- I think it would be like a real big practical problem if we ruled in the way that your friend on the other side wants us to. My understanding is that Minnesota's statute and the states at the founding that were doing this were in the minority. So most states allow for some sort of a surplus or have some sort of mechanism to give the money back to homeowners. So what is the big practical problem that we would face? So, Justice Jackson, no state actually does what they're seeking, at least Reply Brief page 4, which is the fair market value at the time of taking. So that's not one state. Twenty states, I think they agree, do what Minnesota is doing here. So you jeopardize those. And indeed, more than half the states, as the NLTA brief points out, don't automatically return the surplus. Not automatically, but I mean they have some mechanism whereby a person can get the money back. But again, it's very restricted in many of those states, and it's got to be done under a very, very fast time frame akin to my conversation with Justice Kagan before. So there's actually a worry that if you constitutionalize in this area, and this is what the Minnesota brief says at page 6, you'll force states into shorter periods for statute of limitations and redemption periods, making things even harder for individual taxpayers. If you had a $10,000 income tax bill due, and the government came in and took your $100,000 bank account and didn't give you the $90,000 back, taken? Takings, yeah. So what's the difference? It's not a reasonable condition on property ownership, which is a different line of cases, a different suite of authorities, because in that kind of circumstance, tracing all the way back to the founding, you have in rem liability to the government in that circumstance. Is the difference historical only, or is there some functional difference? We think it's mostly historical. There might be a functional difference because it is in rem, so the government has the bidder in the suite. It can only go after the property to the extent the property is worth anything. As the Chief Justice said, sometimes properties are underwater. So one of the reasons that... If the mind rebels at the notion that the government can seize your $100,000 bank account and not give you back the $90,000 that you don't owe, if the mind rebels at that, why should whether it's what was going on in 1200 or what was going on in 1776 change anything about that? Justice Kagan, I'd say you'd have to be pretty darn sure that this was a constitutional violation and not just your policy preferences at that point when you have precedent like Nelson, which is approving $65 and $7,000, and you've said... We definitely have a different view of Nelson. My view of Nelson is you can get your money back by filing a form. And we can then, if that's true, that's just as true for Minnesota, indeed even truer, because it's much easier to get your money back under this statutory scheme than the might you get your money back, which was the language of Nelson, and you only had 20 days to do it there. Here you've got about six years to do it. You had 20 days after the sale. No, 20 days after the forfeiture, before the sale, Justice Kagan. But you had all the time that you weren't paying your taxes in the same way that you have all that time in this statute. I guess what I'm asking is, like, what's the difference? Why should land be treated so much more favorably that the state can just keep the whole when the state could never do that with cash? It's not as much about land being different as there is a different historical tradition. And when you were to ask under Texaco whether this is a reasonable condition on ownership, you go back and look at that. This court has said time and again there's a real difference between what's good policy and what's outrageous. Nelson, that language I read to you is all about it, and what is unconstitutional. There's been huge variation, as they acknowledge, in the states from the founding on. That variation really underscores that something beyond just constitutional restrictions are at stake. There are different policy objectives that different states have, and going back to Justice Jackson's question, and for this court to constitutionalize it and to change the game is really going to force rigidity on the states and risk, as Justice Sotomayor was pointing out, really different valuation schemes in different district courts, not fair market value or something else. Mr. Coggio, what about Justice Alito's question about the car? So Justice Kagan's asking, is the bank account different? What about the hypothetical of you owe, like, $20 of parking tickets. Can the state just take your whole car? Again, I don't think that would be a reasonable condition on ownership because there is no tradition that goes back that could be looked to. Well, there weren't cars. Well, but buggies, whatever. Your buggy? Whatever. I mean, you know, there isn't something to look to, and I don't want to say that that's a complete straitjacket on governments, but I think here all you need to decide is you look at this statute and the other 19 states that have exactly, you know, have very similar statutes in the United States. The property is just real property and it's sui generis. Well, I think it's that the tradition of real property, at least, is what would decide this case. I don't want to say that it's just, it's actually something about the property or the in rem thing specifically, but I do think that that tradition is a very good guide here, and I think this court should be. Why would we read the Constitution to disfavor real property, though? That seems very counterintuitive. I don't think it's a disfavoring or favoring. I think that the government, you know, governments have understood, Justice Kavanaugh, that land is kind of unique because it is the source on which wealth, particularly early wealth, was created, and so there are incentives to encourage productive use. That's what the abandonment cases and the adverse possession cases are all about. So there actually is some different tradition when it comes to land ownership. Here we think to the extent you think abandonment is okay, this is a classic case of abandonment. She even said she wanted to abandon this condo. Counsel, I think you're right that there's a difference between the value that our history places upon money and property, but I think it's the exact opposite of what you're saying, and I think our cases bear this out, where they talk about property, you know, land being essential to the preservation of liberty, and it's a bulwark against the dominance of the state. Money, on the other hand, you know, inflation is worthless, but land is still there. And to say that there's a greater degree of protection for money as opposed to property I think has it exactly backwards. I don't know if I'm saying it's a greater protection or not. I think I'm just saying for purposes of this case, all you have to do is look to, Mr. Chief Justice, the land cases. Like Texaco, page 525 of Texaco says we are treating this property just like a, quote, fee simple. And what it said is if it's a reasonable condition on ownership in there, if you just didn't register your claims, then you were out all of the money that you had spent in the land itself and all the improvements with respect to the mining in that land. Well, but, I mean, we've heard a lot to raisin case. I mean, there they said there was no doubt you've got your raisins, and there's no doubt they could come along and say you owe us 10% of the value. Fine. But as soon as they say we're taking 10% of your raisins, whole nother game. 100% right, Mr. Chief Justice. In that case, you had a statute, the raisin thing, which isn't some reasonable traditional thing. It didn't hearken back to something that states had done or governments had done from the founding. And, indeed, your opinion for the court there quoted the Tucker treatise and said the whole point of the takings clause is to think about reasonable expectations of property. And we absolutely agree. St. George Tucker said that the 1790 statute is a permissible example of government operating, and it was completely taking all of the land. Well, then why would they, I'm into my other allocation of time here, why would they say that they, yes, you could have a tax on the raisins for whatever amount, but, no, you can't take them? Because I think the tax is something that is a reasonable condition, whereas taking them, it doesn't have the same historical tradition. And so we're just saying here, you know, this is the test this court has used from Texaco on, and we think it should apply here, and that's what explains Nelson. And if states, as Justice Jackson points out, want to do things differently, they're, of course, free to do so. We're not saying our rule is constitutionally compelled, but we don't think that the states have a constitutional straitjacket. Justice Thomas? Mr. Cottrell, you referred to the Virginia statute a couple of times, a number of times. And do you have any examples of the application of that statute in a case where the taxes, the amount recovered, the amount of land was in excess of the taxes owed? So the Tucker Treatise just says it does happen. I don't think we've looked for a formal case in which it did, but I think the important point, Justice Thomas, is if this were unconstitutional, if this were a violation of fundamental rights, you certainly would have expected this expert, Tucker, to have said so in his commentary. The fact that he went out of his way to praise it do suggest to us that this was not unconstitutional as the way the founders understood it. But I could also conclude on the other side that in a state where you had a number of individuals who were land rich and money strapped, that you would have examples of an entire state being forfeited for a modest tax, if you were right. Well, I don't know. There are very few reported cases, of course, at this time across the country anyway, and certainly for land disputes. We do point out that it's not just Virginia and not just Kentucky in 1801. It's Maine 1836, Arkansas 1837, and many other states that are brief isolates. So this was a common feature in the 19th century. I'm only saying that the fact that you see nothing, you don't see, you don't have an example, also indicates that perhaps they did simply liquidated what was necessary to cover the taxes. I suppose, but I think it might just reflect, Justice Thomas, the fact that nobody thought there was any problem with this, so there was no litigation to be had. Well, I think Jefferson would. He was always money strapped, and he didn't exactly think fondly of big government. Well, again, I think it's telling that even Jefferson never said that the statute in Virginia posed any problems whatsoever. That's perhaps because it was never applied in the way that you suggest. Well, again, I think the fact that it was written about in the most important treatise, Blackstone's treatise of the time, with praise, and there's no, you know, nothing from Jefferson or Tucker or anyone else, I think is indicia. Again, I don't think it's our burden, Justice Thomas, to prove that there wasn't a constitutional violation. I think they've got to, you know, they're seeking to topple not just this court's decision in Nelson, but 200 years of constitutional freedom for the states. I think they've got to affirmatively prove it up. Justice Levy? Well, let's say that the state is able to get a fair valuation of the property, and, in fact, a valuation of the property that, if anything, is overly generous to the state. And let's say that the state is also able to get compensation for all of its administrative expenses. Then the question arises, why should the state be allowed to keep more than that? And you argue that history supports that, or, rather, there is no history supporting the idea that the state can't do that. But do you have any other answer as to why the state should be allowed to keep anything more than I've just outlined? Sure. I think the government in that circumstance is worried about balancing the rights of delinquent taxpayers against the rights of all other taxpayers. And I think they've decided that in these 20 states that do it this way, that the best way to encourage the disposition of land in these circumstances and houses is to basically incentivize the owner to sue. Because, as this court said in BFP, when the government sues, and this is built into your hypothetical, you get much less money than when individuals sue. Forced sales, you know, have restricted auctions, and very few people come. And so BFP says it's way below market. So the best way to maximize, these 20 states have decided, value is by saying, owners, you sue. Now, what's the way to get owners to sell? A harsher statute like this, to be sure it's harsher, because you know if you don't sell it yourself, the government's going to sell it and not sell it for very much. So that's, I think, what the amici briefs talk about. Justice Alito? Well, that seems to be a dispute about how, or a question about how the property is to be valued. But what I was saying is that if the valuation of the property is done in a way that is generous to the government, why should it get more than that? So if you mean by generous to the government, low amounts, I'm not sure if you meant by generous to, do you mean lower than fair market value or higher? I mean that the government is made whole. Yeah, so again, we think, and it might be fighting the hypothetical, but all these states are saying we can't get the full value of the property through forced auctions, and your own decision in BFP recognizes exactly that. And so that's the policy rationale. To maximize the amount at stake, that's the way to do it. And also government's fear, and this is also in the amici briefs, that if they're forced to be the realtor of last resort, even if they sell it at a high enough price, they could get sued for not selling it at a price that the owner wants or not suing it fast enough and the like. They didn't get into the business of being real estate agents, but that's the position they will be in. And the amici point out that this court's decisions about chilling effects for government officers will be at play here. The moment they start selling, they'll expose themselves to lawsuits, so they just won't sell. And that will create all sorts of cash flow problems. Thank you. Does this show who they are? Why aren't the state centers fully accommodated if they can just put a fairly meaningful penalty on it? Well, because if they're still forced to sell in that circumstance... Well, it's a penalty that has the kind of effect that you think this scheme has. In other words, the state won't have to be in the position of a real estate agent, because somebody will say, oh, that's a pretty big penalty. I don't want to have to lose that. I think that states could do that. I think that states, tracing all the way back to 1790, have understood that complete forfeiture is another way to deal with this and a way to highly incentivize people in ways that a penalty may not be able to do. Suppose Ms. Tyler sold off the property to pay the tax debt and associated fees. Could the county come after her for the rest of the value of the property? If she sold it... So we're back in 2000, before titles transferred, and she sells it? Yes. She owns the property. She has a tax debt. Instead of the state having anything to do with taking the property, she says, I'm going to pay off this $5,000 or whatever by selling the property. My question is, could the county say, when you sold off the property for $40,000, we're entitled to the difference? I think because it's in REM, I think she probably couldn't do that, but the government might be able to impose a constructive trust in that circumstance. I think I'm not asking my question correctly, so forgive me. My question is, if the tax debt was satisfied by her selling the condo, and she gave the government $5,000, could the government say, we want the full $40,000 that was the purchase price of the condo? I understand the hypothetical. She's not owed to the government $40,000. She just owes the taxes and penalties. Correct. Once the taxes and penalties are paid, then I don't think that the government can take... But why isn't the logic of your argument that the government could? I mean, that's the thing I'm struggling with, because you seem to suggest that just because she owes this money, the government is entitled to extinguish her entire right in the property and any money that is incurred above the tax debt. So I don't know why the government couldn't seek to get the money, even if she sold the property to satisfy the tax debt. Because I think the relevant thing is when title is transferred, and when title is transferred, the entire value is transferred to the government. I understand that she's challenging the title transfer in this way. She's saying... Actually, no. Well, what I'm saying is she says you can take the title to liquidate it and take out the tax money, the rest of which redounds to me. You say we can take the title in its entirety and not liquidate it in the sense of giving it back to her. We can just sell it as though we owned the whole thing outright. If that's true, I don't understand why she couldn't sell it herself, pay off the tax debt, and you then would, I guess, have the same argument with respect to some sort of entitlement to the entire amount. I'm not sure we'd have the same argument, because we wouldn't have the same tradition and reasonable condition on ownership. We're only defending what Minnesota does here, which is say when title is fully transferred to the government, at that point her property rights are extinguished, just like Texaco, and the government then has full access to the money. We're not saying anything about before that moment of title transfer. Thank you. Thank you, counsel. Rebuttal, Ms. Martin. Justice Kagan asked earlier what's the limit on the county's view, and the answer is there is none. Under the county's theory, you can have exactly what happened in Michigan when a county took an entire home that was worth at least $25,000, at least that's what it fetched at an auction, over an $8.41 tax delinquency. And you can have the situation in Nebraska, where an elderly widow in a nursing home lost her million-dollar farm over a relatively small debt. And I think the Constitution puts those limits. The county suggests that due process can do the work of the takings clause, but it can't. It is not just compensation, and this court said in Jones v. Flowers that the failure to protect your property interests does not excuse the government of its constitutional obligations. The court also noted in Jones v. Flowers that it is an extraordinary power to take property and forcibly sell it to collect a tax debt, and there the statute at issue in that state actually protected the surplus proceeds. So how much more extraordinary when the government just simply gets to take everything left over after that? The county claims state after state supports its view of history, but that's illusory. There were those two states. We responded in our reply brief that they failed to cite even a single example of where there was a confiscatory forfeiture, and in fact, St. George Tucker himself refused to enforce such forfeiture multiple times, including in Nelson v. Barber and in Kinney. Under our theory, the taking in this case happens at the exact same time as the Solicitor General's view because that's when the government extinguished Ms. Tyler's interest in being paid for her equity. That was July 2015. But that will not put states at risk. They'll still be able to collect taxes without running afoul of the Takings Clause. I'll just point again to the Utah amicus brief. They were joined by seven other states, and they cite several examples of how states can collect taxes without violating the Takings Clause. As for Texaco, Texaco was entirely distinguishable. That, too, was a self-executing statute of limitations that settled stale claims between two private parties. By contrast, the statute here is self-dealing, that takes from an individual and gives it to the government. It was also a minimal paperwork burden case where all the property owner had to do was file a form to preserve their property interest. If there are no further questions, we will just simply ask this Court to reverse and remand. Thank you, Counsel. The case is submitted.